Slip Op. 07-166

UNITED STATES COURT OF INTERNATIONAL TRADE

_____
                                            :
WINDMOELLER & HOELSCHER
    CORPORATION,                            :

                              Plaintiff,    :
                                                       Court No. 03-00722
                    v.                      :

UNITED STATES,                              :

                             Defendant.     :
_____   :

[Plaintiff's motion for summary judgment denied; Defendant's cross-motion for summary judgment granted, and action dismissed.]

                                        Dated:  November 14, 2007

    Sullivan & Lynch, P.C. (Herbert J. Lynch), for Plaintiff.

    Peter D. Keisler, Assistant Attorney General; Barbara S. Williams, Attorney in Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Mikki Graves Walser); Su-Jin Yoo and Chi S. Choy, Office of the Assistant Chief Counsel, International Trade Litigation, U.S. Customs and Border Protection, U.S. Department of Homeland Security, Of Counsel; for Defendant.

**OPINION**

RIDGWAY, Judge:

    In this action, Plaintiff Windmoeller & Hoelscher Corporation ("Windmoeller") contests the

denial of its protest challenging the U.S. Customs Service's rejection of an "unused merchandise

drawback" claim filed by the company.[1]  Windmoeller seeks to recover as drawback[2] a portion of

the duties that it paid on a flexographic printing press that it imported from Germany, because two

major components of that printing press had to be returned to the foreign manufacturer after they

were damaged when they were dropped by the stevedores unloading the ship.  *See generally*

Plaintiff's Brief in Support of Plaintiff's Motion for Summary Judgment ("Pl.'s Brief") at 1-5;

Plaintiff's Brief in Opposition to Defendant's Cross-Motion for Summary Judgment and In Reply

to Defendant's Opposition to Plaintiff's Motion for Summary Judgment ("Pl.'s Reply Brief") at 2-4.

The Government maintains that Customs properly denied Windmoeller's drawback claim.

The Government argues, in essence, that Windmoeller imported and entered – and paid duties on

– the printing press *as an* (*unassembled*) *whole*, but then later exported only *parts* of it.  And,

---

[1] The U.S. Customs Service – formerly part of the U.S. Department of the Treasury – is now part of the U.S. Department of Homeland Security, and is known as U.S. Customs and Border Protection.  The agency is referred to as "Customs" herein.  *See* Homeland Security Act of 2002, Pub. L. No. 107-296, § 1502, 116 Stat. 2135, 2308; 72 Fed. Reg. 20, 131 (April 23, 2007).

[2] "Drawback" is "a refund of duty paid on imported merchandise that is linked to an exportation (or destruction) of an article."  *See* U.S. Customs and Border Protection, "What Every Member of the Trade Community Should Know About Drawback" at 7 (Dec. 2004).

There are several different types of drawback.  *See generally id.* (discussing manufacturing drawback, unused merchandise drawback, and rejected merchandise drawback).  As the Court of Appeals recently noted, and as discussed in greater detail below, the provision of the drawback statute here at issue – "direct identification" unused merchandise drawback – provides for drawback "when imported duty-paid merchandise is subsequently exported."  *See* Merck & Co., Inc. v. United States, 499 F.3d 1348, 1350 (Fed. Cir. 2007) (discussing drawback under 19 U.S.C. § 1313(j)(1)).

The Court of Appeals has further noted that "[d]rawbacks are a privilege, not a right.  United States v. Allen, 163 U.S. 499, 504 (1896); *see also* Swan & Finch Co. v. United States, 190 U.S. 143, 146-47 (1903) (Because the drawback statute is a grant of privilege, the construction most advantageous to the interests of the government must be adopted.)."  Hartog Foods Int'l, Inc. v. United States, 291 F.3d 789, 793 (Fed. Cir. 2002).

according to the Government, unused merchandise drawback is not available under 19 U.S.C. §

1313(j)(1) when only *part* of the imported merchandise is exported.[3]  Nor, according to the

Government, is it payable when the value of the exported merchandise cannot be ascertained from

the entry documents.  *See generally* Defendant's Memorandum in Opposition to Plaintiff's Motion

for Summary Judgment and In Support of Defendant's Cross-Motion for Summary Judgment

("Def.'s Brief") at 2-4, 9-13; *see also* Defendant's Reply to Plaintiff's Memorandum in Opposition

to Defendant's Cross-Motion for Summary Judgment ("Def.'s Reply Brief").[4]

Pending before the Court are the parties' cross-motions for summary judgment.  Jurisdiction

lies under 28 U.S.C. § 1581(a) (2000).  For the reasons outlined below, Windmoeller's motion for

summary judgment is denied, and the Government's cross-motion is granted.

---

[3]Except as otherwise indicated, all statutory citations are to the 1994 edition of the United
States Code.  Note also that the drawback statute was amended in 1993 to, among other things,
replace the now obsolete "same condition" drawback with the "unused merchandise" drawback
provision at issue in this action.  *See* North American Free Trade Agreement Implementation Act,
Pub. L. No. 103-182, § 632, 107 Stat. 2057, 2192.  However, Customs did not promulgate
conforming changes to its regulations for some years.  Accordingly, analysis of some questions
concerning unused merchandise drawback claims may require reference to the 1998 regulations,
even though the drawback claim antedated those regulations.  *See* 19 C.F.R. Part 191, Subpart C
("Unused Merchandise Drawback") (1998).

[4]The Government argues in the alternative that, even assuming that unused merchandise
drawback were otherwise available under the facts of this case, Windmoeller still has failed to
establish the value of the two separate component parts of the printing press which are the subject
of its drawback claim.  The Government asserts that the affidavits submitted by Windmoeller
"provide[] summary conclusions as to value, without more," and maintains that further documentary
evidence "would be required to demonstrate the actual value of the exported articles than . . . what
has been submitted by Windmoeller here."  *See generally* Def.'s Brief at 4, 14-15; Def.'s Reply
Brief at 9-12.  *But see* Pl.'s Brief at 11-12; Pl.'s Reply Brief at 5, 13-14.  In light of the disposition
of this action below, however, there is no need to reach this issue.

# I.  The Facts of The Case

Windmoeller is a manufacturer and distributor of heavy-duty printing and packaging machinery, for commercial and industrial use.  *See* Audiotape of Conference of Counsel with the Court ("Tape") at 11:04.[5]  In the drawback claim at issue here, Windmoeller seeks to recoup a portion of the duties that it paid on a December 10, 1995 consumption entry consisting of six ocean containers and seven seaworthy cases imported from Germany, through the Port of Baltimore.  In those containers and cases were components which – when assembled – would constitute a complete flexographic printing press system (known by the trade name "Olympia Stellaflex 8L"), which had been ordered from Windmoeller by one of its U.S. customers.  *See* Tape at 11:29-11:40.

The various components of the printing press system were not separately classified when they were entered into the United States.  The Entry and Entry Summary (Form 7501) that Windmoeller filed with Customs indicated that the merchandise entered was classifiable as "[f]lexographic printing machinery" under subheading 8443.30.00 of the Harmonized Tariff Schedule of the U.S. ("HTSUS"), dutiable at the rate of 3.1% *ad valorem*.  *See* subheading 8443.30.00, HTSUS (1995); 19 U.S.C. § 1202.[6]  Included with the entry papers were a commercial

---

[5]The facts set forth in this section are largely drawn from the parties' respective Statements of Material Facts and responses thereto, and are not in dispute.  However, certain statements herein are based on representations by counsel made in the course of a September 22, 2006 conference with the Court.  Those facts do not appear to be contested.  But, in any event, they are not material, and are set forth here solely for context.

[6]Pursuant to HTSUS General Rule of Interpretation 2(a), an unassembled or disassembled article is classified as though it were a complete or finished article.  Notes 3 and 4 to Section XVI of the HTSUS further provide that composite machines consisting of two or more machines fitted together to form a whole or consisting of individual components intended to contribute together to a clearly defined function are classified under the tariff provision appropriate to the principal function of the machinery system.

invoice and a packing list, both prepared by Windmoeller & Hoelscher KG of Germany (the manufacturer, seller, and exporter of the merchandise).

The commercial invoice identified the merchandise as "1 flexographic printing press 'Olympia Stellaflex 8L,'" with an ex-factory price of DM 3,971,543.[7] The packing list detailed the contents of each of the six ocean containers and seven seaworthy cases in the shipment. However, neither the commercial invoice nor the packing list, nor any of the other entry papers, itemized the values of Eltainer and the Printing Unit, or any of the other individual components of the printing press.

As the packing list indicated, the two components at issue here – the Eltainer and the Printing Unit – were shipped in cases (1) and (2).[8] Unfortunately, on December 10, 1995 – after the

---

[7]Although the affidavits submitted by Windmoeller state that the ex-factory price of the Olympia Stellaflex 8L was DM 3,971,353, the commercial invoice itself – to which the affidavits refer – indicates that the price was actually DM 3,971,543. *See* Commercial Invoice No. 95.328 (Oct. 31, 1995); *see also* Plaintiff's Statement of Material Facts ¶ 10. The commercial invoice further states that the ex-factory price of DM 3,971,543 includes an "after installation maintenance and technical assistance fee" of DM 128,703, and that the merchandise's value for customs purposes is DM 3,842,840. *See* Commercial Invoice. The commercial invoice also appears to reflect a "trade discount" of DM 318,573. *See* Commercial Invoice; Def.'s Reply Brief at 11-12.

According to the Government, the printing press was valued at $2,742,993 for tariff purposes, and – at 3.1% – the assessed duties totaled $83,358.78. *See* Def.'s Brief at 6, 14; Def.'s Reply Brief at 10. However, it is not clear from the record of the case whether the figure of $2,742,993 corresponds to DM 3,971,543, or to DM 3,842,840, or to some other figure. In light of the disposition of this action below, however, the precise value of the merchandise for customs purposes is not material.

[8]According to Windmoeller, "Eltainer" is a trademark term used by Windmoeller & Hoelscher KG to describe a metal enclosure containing all the electronics and controls, as well as the operational and connecting cables, necessary for the use and operation of the printing press system; and the Printing Unit is the "essential and primary machine" of the system. *See* Pl.'s Brief at 2.

merchandise had been released from Customs' custody, and as it was being offloaded from the ship – stevedores dropped the two cases containing the Eltainer and the Printing Unit. Windmoeller made arrangements to have the two components exported back to the German manufacturer, to determine the extent of the damage and to take appropriate action.[9] And, on January 25, 1996, Windmoeller filed an unused merchandise drawback claim with Customs pursuant to 19 U.S.C. § 1313(j)(1), seeking a partial refund of the duties paid on the Olympia Stellaflex 8L.

In general, the provision of the drawback statute invoked by Windmoeller provides for the refund of 99% of the duties paid if imported merchandise is exported or destroyed within three years of importation without being used in the United States:

> (j)     Unused merchandise drawback.  (1) If imported merchandise, on which was paid any duty, . . . imposed under Federal law because of its importation –
>
> (A)     is, before the close of the 3-year period beginning on the date of importation –
>
> (i)     exported, or
>
> (ii)     destroyed under customs supervision; and
>
> (B)     is not used within the United States before such exportation or destruction;
>
> then upon such exportation or destruction 99 percent of the amount of each duty . . . so paid shall be refunded as drawback.

19 U.S.C. § 1313(j)(1).

Windmoeller's drawback claim sought a refund of US$ 52,854.04 – a sum that Windmoeller

---

[9]Apparently, it was not practicable for the German manufacturer to assess the damage and determine the appropriate course of action while the two components remained in the United States. *See* Tape at 23:16-23:42.

calculated to be 99% of "the duty paid on the importation of the Eltainer and the Printing Unit."

Pl.'s Brief at 4. Windmoeller, in turn, calculated the amount of "the duty paid on the importation

of [the two components]" by applying the 3.1% duty rate for "[f]lexographic printing machinery"

under HTSUS subheading 8443.30.00 to US$1,718,934 – the value of the Eltainer and the Printing

Unit as reported on the Shipper's Export Declaration that Windmoeller filed with its drawback

claim. *See* Pl.'s Brief at 4; Pl.'s Reply Brief at 3.[10]

The damaged Eltainer and the Printing Unit were exported back to Germany in late January

1996. The German manufacturer eventually determined that the Printing Unit could be repaired, but

that the Eltainer was not salvageable. *See* Tape at 13:43-14:10; 24:09-24:22, 53:27-53:35. In the

meantime, however, Windmoeller had procured replacement components from the German

manufacturer,[11] so that Windmoeller could fulfill its contractual commitment to its U.S. customer.

*See* Tape at 14:22-14:44, 24:22-24:33, 32:35-33:02, 34:35-35:16. The two replacement components

were imported in March 1996, and were classified as "[p]arts" of "[p]rinting machinery," dutiable

at a rate lower than the 3.1% rate applicable to "[f]lexographic printing machinery." *See* Tape at

33:09-33:49, 34:31-34:35, 35:40-35:44.[12] The stated value of the replacement Printing Unit and

---

[10]According to Windmoeller, the German manufacturer's Area Sales Manager determined the individual component values of the Eltainer and the Printing Unit "by reviewing internal cost of production calculations, price lists, parts records and files" that are maintained by the manufacturer. *See* Pl.'s Brief at 3-4 (and authorities cited there); Pl.'s Reply Brief at 3, 5, 13-14.

[11]The German manufacturer repaired the original Printing Unit, for sale to some other customer overseas. That particular component was not returned to the United States. *See* Tape at 14:18-14:21, 53:27-53:35.

[12]In the conference with the Court, counsel indicated that the replacement components imported in 1996 were classified as "[p]arts," and were dutiable at the rate of 2.2% *ad valorem*. *See* Tape at 35:28-35:40. However, if the replacement components were classified as "[p]arts" under

Eltainer – which Customs did not challenge – closely approximated the value of the two original

components as specified in the Shipper's Export Declaration filed by Windmoeller as part of its

drawback claim.  *See* Tape at 33:09-34:21, 59:12-1:00:13, 1:41:48-1:42:03.

The undamaged components from the December 1995 shipment had already been delivered

to Windmoeller's U.S. customer.  The replacement Printing Unit and Eltainer, imported in March

1996, were installed at the customer's site, to complete the Olympia Stellaflex 8L flexographic

printing press system which the customer had ordered.  *See* Tape at 32:35-33:02.

In late 2002, Customs denied Windmoeller's drawback claim.  Customs explained:

> This entry is being denied based on Headquarters rulings 221415 dated February 23,
> 1990, 228199 dated March 26, 1999 and 228317 dated December 5, 2000.  All of
> these rulings state that there is no provision in the drawback statute for
> apportionment of drawback on a partial exportation.  They further held that since the
> importation was a single product and there was no method for determining the value
> of the separated exported product from the import documents, drawback could not
> be paid.

Letter from Director, Drawback Branch, Customs, Boston, Massachusetts (Nov. 27, 2002) ("Letter

Denying Drawback Claim").  Windmoeller timely protested Customs' rejection of its drawback

claim, but the protest was denied.

Although Windmoeller filed a claim against the terminal operator for the damage to the

Eltainer and the Printing Unit suffered at the hands of the  stevedores, and although that claim was

---

HTSUS subheading 8443.90.50, it appears that the applicable duty rate actually would have been
2%.  *See* subheading 8443.90.50, HTSUS (1996).

In any event, whether the duty rate applicable to the replacement components was 2% or
2.2%, it was lower than the 3.1% rate applicable to "[f]lexographic printing machinery."  Often,
however, the duty rate applicable to an *article* is lower than the rate applicable to its "*parts*."  *See*
Tape at 35:40-35:44, 40:02-40:44, 41:35-41:52.

paid, the insurance did not cover all of Windmoeller's losses.  According to Windmoeller, the

company was forced to "pay duties twice," and still has not been made whole.  *See* Tape at 13:34-

13:42, 23:42-24:03, 25:28-25:53.

## II.  Standard of Review

Under USCIT Rule 56, summary judgment is appropriate where "there is no genuine issue

as to any material fact and . . . the moving party is entitled to [ ] judgment as a matter of law."

USCIT R. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  A factual dispute

is genuine if it might affect the outcome of the suit under the governing law.  *See id*.

The parties here do not agree on every specific detail of the events underlying this action.

However, they are in agreement that there is no genuine dispute as to any material fact.  And they

further agree that the sole issue presented is the question of the interpretation of 19 U.S.C. §

1313(j)(1), which is a matter of law to be determined *de novo* by the Court.  *See*, *e.g.*, Lynteq, Inc.

v. United States, 976 F.2d 693, 696 (Fed. Cir. 1992).  This matter is thus ripe for summary judgment.

On review, Customs' rulings are entitled to a measure of deference proportional to their

power to persuade, in accordance with the principles set forth in Skidmore v. Swift & Co., 323 U.S.

134 (1944).  *See* United States v. Mead Corp., 533 U.S. 218, 234-35 (2001); Rocknel Fastener, Inc.

v. United States, 267 F.3d 1354, 1357-58 (Fed. Cir. 2001) (according deference to Customs'

interpretation of tariff provision as set forth in agency's "informed compliance" publication); Park

B. Smith, Ltd. v. United States, 347 F.3d 922, 925 (Fed. Cir. 2003) (finding Customs' position

entitled to deference even in absence of formal agency decision concerning specific merchandise

at issue).

# III.  <u>Analysis</u>

According to the Government, the statutory provision on unused merchandise drawback on which Windmoeller relies – 19 U.S.C. § 1313(j)(1) – does not permit apportionment of drawback on the exportation of only an unused *part* of the merchandise covered by a consumption entry.  *See generally* Def.'s Brief at 2-4, 10; Def.'s Reply Brief at 3-4, 9; *see also* Letter Denying Drawback Claim.  The Government further maintains that drawback under that provision is not available when the amount of duty paid on the exported merchandise cannot be ascertained based on the entry documents, such that some separate appraisement procedure would be required.  *See* Def.'s Brief at 4 (emphasizing that "[a]ssuming, for the sake of argument, § 1313(j)(1) allowed the apportionment of drawback for the exportation of parts of an unassembled imported article, which it does not, the commercial invoice accompanying the consumption entry did not provide a value [for] any of the parts"); *see also id.* at 14; Def.'s Reply Brief at 5-7, 9; Letter Denying Drawback Claim.

In support of its position, the Government points to three Headquarters ruling letters – HQ 226473 (March 16, 1996), HQ 228199 (March 26, 1999), and HQ 228317 (Dec. 5, 2000).  According to the Government, those determinations illustrate that, in recent years, Customs has consistently ruled that unused merchandise drawback under § 1313(j)(1) is not available under circumstances such as those presented here.  *See* Def.'s Brief at 4, 8, 10-12; Def.'s Reply Brief at 1-2, 7; Letter Denying Drawback Claim.

In HQ 226473, Customs considered whether pistols which were imported with magazines and later exported without magazines were eligible for drawback under § 1313(j)(1).  Customs

denied the drawback claim in that case, explaining that "[i]n terms of the specific language of [the statute], the 'imported merchandise' (a pistol with magazine) is not 'exported,'" and further stating that "there is no language in [the statute] which would permit Customs to make adjustments in the amount paid, *i.e.*, assuming *arguendo* that Customs determined that it was appropriate to pay drawback in this situation, the value of the exported item is less than the value of the imported item." Customs continued:

> Thus, it would seem clear that the payment of "99 percent of the amount of each duty" would not adequately protect the revenue. 19 U.S.C. 1313(j)(1) is silent with respect to any adjustment of the amount of drawback payable in a situation where the exported merchandise is of a lesser value than the imported merchandise. This reinforces our conclusion that drawback is not payable under 19 U.S.C. 1313(j)(1) in a situation where the exported merchandise is not the same as the imported merchandise.

Accordingly, Customs held that "[a] pistol which is imported with a magazine and exported without a magazine is not eligible for drawback pursuant to 19 U.S.C. 1313(j)(1)." *See* HQ 226473; *see generally* Def.'s Brief at 10-11; Def.'s Reply Brief at 2-3.

Similarly, in HQ 228199, Customs ruled that "the plain language of the statute requires that drawback be paid upon the exportation of the imported merchandise." In that case, Customs denied drawback where lamps had been imported, but only defective lamp arms were returned to the exporting country. Customs stated that "[t]here is no provision, in 19 U.S.C. § 1313(j)(1), for apportioning the duties paid on the imported merchandise (a complete lamp) to the exported merchandise (lamp arms)." Customs elaborated that "there is no support in the language of the statute (or legislative history) to support a conclusion that an imported article may be disassembled and drawback claimed on only certain parts of the article which are exported, based on an

apportionment of the duties paid on the imported article." Elsewhere, Customs stated that "[t]here is simply no language in 19 U.S.C. 1313(j) which permits Customs to apportion drawback when *a component* of the imported merchandise, rather than *the imported merchandise itself*, is exported." (Emphases added.) *See* HQ 228199; *see generally* Def.'s Brief at 11; Def.'s Reply Brief at 3.

Finally, in HQ 228317, Customs denied drawback on the exportation of individual rugs which had been imported as sets of rugs of different sizes. Customs there expressly rejected the importer's claim that there was no requirement "that the complete duty paid item (in this case, a set of three rugs) be exported in order to qualify for unused merchandise drawback." Customs stated that the statute on its face includes "no provision . . . for apportioning the duties paid on the imported merchandise (a rug set) to the exported merchandise (individual rugs)." Customs further emphasized that "[t]he value and duty paid on the individual rugs cannot be determined from the entry documents. . . . The determination of the amount of duty paid for the individual exported rugs can only be approximately determined, by apportionment, and requires reference to other invoices for individual rugs and calculations of square footage." In addition, Customs noted that a different provision of the statute specifically provides for the distribution/apportionment of drawback where two or more items result from the processing of imported merchandise, but that – in contrast – there is "no language in 19 U.S.C. § 1313(j) which permits Customs to apportion drawback when *a component* of the imported merchandise, rather than *the imported merchandise itself*, is exported." (Emphases added.) *See* HQ 228317; *see generally* Def.'s Brief at 11-12; Def.'s Reply Brief at 3-4.

Windmoeller contends that the three Headquarters ruling letters that the Government cites are inapposite. *See generally* Pl.'s Reply Brief at 7-9. As to HQ 226473 and HQ 228199,

Windmoeller asserts that "[i]n both cases, the exported item was not identifiable at the time of entry and was a product of the disassembly of the imported article. In contrast, the Eltainer and Printing Unit were clearly identified at the time of importation as functional stand alone units. . . . It is undeniable that Customs knew at the time of entry that the shipment included the Eltainer and Printing Unit." *See* Pl.'s Reply Brief at 8. But the points that Windmoeller raises are distinctions without a difference.

Windmoeller fails to explain why it is significant that the packing list in this case separately listed the various components of the printing press, including the Eltainer and the Printing Unit, such that they were "identifiable at the time of entry." Nor is there any apparent significance to the fact that the pistols and the lamps in the ruling letters at issue had been disassembled, while – in the case at bar – there was no need for Windmoeller to disassemble the printing press before exporting the Eltainer and the Printing Unit, because the printing press had not yet been assembled. It is similarly irrelevant under the statute whether or not the merchandise that is the subject of a drawback claim is a "functional stand alone unit[]." And Windmoeller cannot seriously contend that Customs did not know that complete pistols and complete lamps are comprised of components, such as pistol magazines and lamp arms.

As with HQ 226473 and HQ 228199, Windmoeller also seeks to distinguish HQ 228317 on the grounds that the exported items there at issue (individual rugs) "were not identifiable at the time of entry." *See* Pl.'s Reply Brief at 8-9. However, as discussed above, there is no apparent significance to that fact. Nor can it be argued with a straight face that Customs did not know that the imported merchandise (rug sets) were comprised of individual rugs.

Windmoeller further notes that HQ 228317 emphasized the problem of "accurately determin[ing] the value of the individual rugs being exported." *Id*. Windmoeller seeks to contrast the situation here, where it proffered information concerning the value of the Eltainer and the Printing Unit which was obtained from the German manufacturer. But Windmoeller misses the point. It would have been *possible* to have the individual rugs separately appraised for purposes of calculating drawback (or to have somehow otherwise determined the rugs' value), just as Windmoeller solicited information on the valuation of the components at issue in this case. The fundamental essence of Customs' concern, however, was that the value of the individual rugs could not be ascertained *from the entry papers*. The same is true of the Eltainer and the Printing Unit here.

Contrary to the Government's claims, there is nothing in either the language of the statute or the legislative history which would preclude Customs from granting drawback under 19 U.S.C. § 1313(j)(1) under circumstances such as those presented here.[13] The plain language of the statute will bear either the meaning asserted by Windmoeller, or the meaning that Customs gives it. To the extent that the Headquarters ruling letters cited by the Government suggest otherwise, their reasoning is flawed.[14]

Nevertheless, the ruling letters cited by the Government demonstrate – at a minimum – that

---

[13]Although nothing in the statute or legislative history would *prohibit* Customs from apportioning drawback under 19 U.S.C. § 1313(j)(1), the Government correctly observes that Congress expressly provided for apportionment elsewhere in the statute. *See* Def.'s Reply Brief at 4 n.1 (*citing* 19 U.S.C. § 1313(a) (1996)). Congress could have expressly provided for apportionment in § 1313(j)(1) as well, but did not do so.

[14]This flaw in the reasoning of the Headquarters ruling letters interpreting 19 U.S.C. § 1313(j)(1) undercuts, to some degree, the deference to which Customs' interpretation of the statute is otherwise entitled. *See* section II, *supra*.

Customs' consistent practice in recent years has been to deny drawback under 19 U.S.C. § 1313(j)(1) where the value of the exported merchandise cannot be ascertained from the entry papers. Similarly, the ruling letters establish – at a minimum – that the phrase "imported merchandise" in § 1313(j)(1) has been consistently interpreted by Customs in recent years to exclude mere *parts* of the merchandise as entered.

Windmoeller points to two different Headquarters rulings letters in an attempt to demonstrate that Customs' interpretation and application of the drawback statute has been characterized by "[v]acillation and inconsistency." *See generally* Pl.'s Reply Brief at 9-11. As a threshold matter, it bears emphasis that the two Headquarters ruling letters that Windmoeller cites predate by almost a decade the ruling letters on which the Government relies. Thus, by definition, those earlier ruling letters cannot call into question the fact that Customs' consistent practice in recent years has been to deny drawback under 19 U.S.C. § 1313(j)(1) where the value of the exported merchandise cannot be ascertained from the entry papers. Nor can those earlier ruling letters detract from the fact that the phrase "imported merchandise" in § 1313(j)(1) has been consistently interpreted by Customs in recent years to exclude mere *parts* of the merchandise as entered. But – even apart from their dates – the two ruling letters that Windmoeller invokes do little to advance its cause.

Windmoeller first cites HQ 217982 (July 1, 1985) (also known as "CSD 85-48"), in which Customs considered whether drawback was available for a crystalline chemical which was dutiable on an *ad valorem* basis, and which was imported in non-reusable metal drums. At the time of entry, the value of the metal drums had been added to the value of the chemical for purposes of assessing customs duties. Later, the chemical was melted and pumped into semi-bulk containers, where it

returned to its crystalline form.  Customs authorized drawback on the chemical, but ruled that –

since the value of the metal drums in which the chemical was imported had been added to the value

of the chemical for purposes of assessing duties at the time of entry – the value of the metal drums

had to be deducted from the total value of the imported merchandise before drawback was

computed.  *See* HQ 217982/CSD 85-48; *see also* Pl.'s Reply Brief at 10; Def.'s Reply Brief at 4-6.

Windmoeller argues that "[s]imilar to Windmoeller's situation, the metal drums [discussed

in HQ 217982/CSD 85-48] were known and identifiable to Customs at the time of entry; duty was

assessed on an *ad valorem* basis; and there existed a valid method to identify the value of the

separated items."  *See* Pl.'s Reply Brief at 10.  HQ 217982/CSD 85-48 is a bit cryptic; but the salient

point – which later Headquarters ruling letters underscore – is that, in that case, the value of the

metal drums, as distinct from the value of the crystalline chemical, could be ascertained on the face

of the entry papers.  *See*, *e.g.*, HQ 228199 (explaining that, in HQ 217982/CSD 85-48, "the

determining factor was that the value of the designated merchandise could be determined *from the

entry papers*") (emphasis added); HQ 228317 (emphasizing that, in HQ 217982/CSD 85-48, "the

determining factor was that the value of the designated merchandise could be determined *from the

entry papers*") (emphasis added).  In contrast, in the case at bar, the entry papers specified the value

of the flexographic printing press as a whole.  The entry papers did not separately itemize the values

of the Eltainer and the Printing Unit, or any of the other individual components of the printing press.

The second Headquarters ruling letter that Windmoeller points to is HQ 719606 (Aug. 24,

1987).  There, although complete subway cars had been imported, Customs authorized drawback

(albeit under a different provision of the drawback statute) for non-conforming subway car shells

which were to be crushed under Customs' supervision.  *See* HQ 719606; *see also* Pl.'s Reply Brief

at 10-11; Def.'s Reply Brief at 6-7.  Windmoeller emphasizes:

> Ruling 719606 cautioned that the importer must conclusively establish the amount
> of duty paid on the car shells removed from the subway car.  Like the subway car
> importer, Windmoeller has the burden of establishing the duty paid on the Eltainer
> and Printing Unit when duty is assessed on an *ad valorem* basis on the value of the
> entire shipment.

*Id*.  Windmoeller concludes that it has "employed a valid method of determining the[] values" of the

Eltainer and the Printing Unit here.  *Id*.

Windmoeller correctly observes that "Customs authorized drawback [in HQ 719606] even

though the [subway] car shells were not the 'imported merchandise,'" as the Government here

defines that term.  *See* Pl.'s Reply Brief at 11.  However, as noted above, not only did HQ 719606

involve a different provision of the drawback statute, but it also predated the more recent

Headquarters ruling letters that evidence Customs' consistent interpretation of "imported

merchandise" as that phrase is used in 19 U.S.C. § 1313(j)(1) – the drawback provision at issue in

this action.

Most significantly, Windmoeller ignores Customs' ultimate holding in HQ 719606 – that

drawback was authorized "as long as the actual amount of duty paid on the rejected merchandise is

identifiable *from entry documents*."  *See* HQ 719606 (emphasis added); *see also id*. (explaining that

"[t]his ruling holds that imported merchandise not conforming to sample or specifications" is

eligible for drawback "provided the duty paid on the exported merchandise is identifiable from

ENTRY documents," and that "[d]rawback is allowed on the subway car shells insofar as the

importer is conclusively able to establish the amount of duty paid for the particular item of rejected

merchandise.  The Customs officer must be able to verify *from the entry documents* the amount of duty paid on the car shell, apart from the merchandise that is not rejected.") (second emphasis added).  In short, like HQ 17982/CSD 85-48, HQ 719606 hurts Windmoeller far more than it helps.

Distilled to its essence, the question that this action presents is not whether Customs *could* grant drawback under 19 U.S.C. § 1313(j)(1) where only an unused *part* of the entered merchandise is exported, such that the value of the exported merchandise cannot be ascertained from the entry papers and some additional appraisement procedure would be required.  Rather, the question is whether Customs *must* do so.  Simply stated, nothing in either the statute or the regulations *mandates* that Customs devise and undertake any special appraisement procedures of the sort that Windmoeller's reading of the statute would seem to require.  Moreover, at least in recent years, Customs has consistently refused to undertake such procedures in circumstances similar to those presented here.

At least at first blush, this result may seem harsh.  But the facts of this case – while quite sympathetic – are unusual.  And, in any event, Windmoeller was not without other options (although, to be sure, each of those options had its pros and cons).

Thus, for instance, if Windmoeller had initially decided to import the various individual components of the printing press separately, in different shipments, those components could have been entered (and invoiced) separately[15] – and any components damaged by the stevedores then

---

[15]As the Government emphasizes, "[h]ad the Eltainer and the printing unit been imported separately, different duties and values would have applied."  *See* Def.'s Brief at 14.  In this instance, the separately entered Eltainer and Printing Unit would have been classified as "[p]arts," and would have been dutiable at a rate somewhat lower than the 3.1% *ad valorem* rate applicable to the complete printing press system, which was classified as "[f]lexographic printing machinery."  *See* n.12, *supra*.

would have been eligible for drawback under Customs' interpretation of 19 U.S.C. § 1313(j)(1).  But no doubt there were a host of logistical, financial, and commercial considerations that militated in favor of shipping the components together, and entering the merchandise as a complete printing press.[16]  Windmoeller made a business decision.

Further, even though it imported the merchandise as a complete printing press, Windmoeller nevertheless would have been entitled to drawback under Customs' interpretation of § 1313(j)(1), *if* Windmoeller had chosen to export the entire printing press – including not only the damaged Eltainer and Printing Unit, but also the other undamaged components as well.  Again, however, there were no doubt a host of logistical, financial, and commercial considerations that weighed in favor of returning only the damaged components to the German manufacturer, and retaining those that were undamaged.  Windmoeller made a business decision.

Indeed, even though Windmoeller elected to export only the damaged components, it could have avoided much of the expense that it complains of here if it had chosen to have those components returned to the United States after repair (rather than procuring and importing replacement components instead).  When the repaired components were re-imported, Windmoeller would have owed duties only on the value of the repairs.  *See* subheadings 9802.00.40 & 9802.00.50, HTSUS (1996).  Again, however, there were no doubt a host of logistical, financial, and commercial considerations that counseled in favor of procuring and importing replacement

---

[16]For example, importing all the components of the printing press system in a single shipment presumably yielded savings for Windmoeller on logistics and transportation.  Further, as note 12 (above) explains, the tariff rate applicable to an *article* is often lower than that applicable to its *parts* (although that was not true in this case).

components, rather than awaiting repairs. Windmoeller made a business decision.[17]

Perhaps it is even possible that the outcome in this action might have been different if the values of the Eltainer and the Printing Unit could have been ascertained from the entry documents. *See generally* Tape at 43:00-43:37, 46:32-48:28; *cf*. HQ 217982/CSD 85-48; HQ 719606. *But see* Tape at 49:27-49:32, 49:59-50:11. But that is another case for another day. For purposes of this action, it suffices to say that neither the statute nor the regulations require Customs to devise and undertake special appraisement procedures and grant drawback under 19 U.S.C. § 1313(j)(1).

## IV. Conclusion

For all the reasons set forth above, Customs did not err in denying Windmoeller's drawback claim under 19 U.S.C. § 1313(j)(1), and its related protest. Windmoeller's motion for summary judgment is therefore denied, the Government's cross-motion is granted, and this action is dismissed.

Judgment will enter accordingly.

                                         /s/ Delissa A. Ridgway
                                         Delissa A. Ridgway
                                              Judge

Decided:  November 14, 2007
              New York, New York

---

[17]In fact, in this case, the German manufacturer determined that one of the two components at issue – the Eltainer – was damaged beyond repair. *See* section I, *supra*.

UNITED STATES COURT OF INTERNATIONAL TRADE

_____ :

WINDMOELLER & HOELSCHER
  CORPORATION,                                   :

                        *Plaintiff*,              :

                v.                               :

UNITED STATES,                                 :

                 *Defendant*.             :
_____ :

Court No. 03-00722

## **JUDGMENT**

      This action having been duly submitted for decision; and the Court, after due deliberation, having rendered a decision herein;

      NOW, therefore, in conformity with said decision, it is

      ORDERED that Plaintiff's motion for summary judgment be, and hereby is, denied; and it is further

      ORDERED that Defendant's cross-motion for summary judgment be, and hereby is, granted; and it is further

      ORDERED that the determination of the Bureau of Customs and Border Protection denying Plaintiff's protest of the denial of its drawback claim be, and hereby is, sustained; and it is further

      ORDERED, ADJUDGED, and DECREED that this action be, and hereby is, dismissed.


                                        __  /s/ Delissa A. Ridgway  __
                                          Delissa A. Ridgway, Judge


Dated:  November 14, 2007
        New York, New York

# NOTICE OF ENTRY AND SERVICE

This is a notice that an order or judgment was entered in the docket of this action, and was served upon the parties on the date shown below.

Service was made by depositing a copy of this order or judgment, together with any papers required by USCIT Rule 79(c), in a securely closed envelope, proper postage attached, in a United States mail receptacle at One Federal Plaza, New York, New York 10278 and addressed to the attorney of record for each party at the address on the official docket in this action, except that service upon the United States was made by personally delivering a copy to the Attorney-In-Charge, International Trade Field Office, Civil Division, United States Department of Justice, 26 Federal Plaza, New York, New York 10278 or to a clerical employee designated, by the Attorney-In-Charge in a writing filed with the clerk of the court.

or

Service was made electronically, by the Court's CM/ECF system, upon those parties that have filed a Notice of Consent to Electronic Service.

Tina Potuto Kimble
Clerk of the Court

Date: _____     By: _____
                                          Deputy Clerk